JUDGE FRANK MONTALVO

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | |
|---|---|
| **ABRAHAM PEINADO,** | § § § |
| **Plaintiff,** | § § |
| **EVERQUOTE, INC.,** a Delaware Corporation, and **LIBERTY MUTUAL GROUP INC.,** a Massachusetts Corporation | § § § § § |
| | § § § |
| **Defendants.** | § § |

**FILED**

MAY 2 7 2022

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

# EP22CV0188

## COMPLAINT:

### Preliminary Statement

1.      As the Supreme Court recently explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. . . For nearly 30 years, the people's representatives in Congress have been fighting back." *Barr v. Am. Ass'n of Pol. Consultants LLC*, 140 S. Ct. 2335, 2343 (2020).

2.      Plaintiff ABRAHAM PEINADO ("Plaintiff") brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, alleging that Defendant EVERQUOTE, INC. commissioned a series of automated telephone calls to originate new customers by calling cellular telephone numbers listed on the National Do-Not-Call Registry, like Plaintiff's number, which is prohibited by the TCPA. The calls were made from or on behalf of Defendant EVERQUOTE, INC. and at the supervision, direction, and control of Defendant LIBERTY MUTUAL GROUP INC.

3.      Plaintiff never consented to receive any of these calls, which were placed to him for telemarketing purposes.

## Parties

4.      The Plaintiff is ABRAHAM PEINADO ("Plaintiff"), a natural person, resides in Santa Teresa, New Mexico, with his place of employment in the Western District of Texas, and was the individual who received the alleged phone calls in this case on his private mobile telephone, and was present in Texas for all calls, in this case in El Paso, Texas.

5.      Defendant EVERQUOTE, INC. ("Everquote") is a corporation organized and existing under the laws of Delaware with its principal address at 210 Broadway, Cambridge, Massachusetts 02139 and can be served via registered agent C T Corporation System at 1999 Bryan Street., Ste. 900, Dallas, Texas 75201.

6.      Defendant LIBERTY MUTUAL GROUP INC. ("Liberty") is a corporation organized and existing under the laws of Massachusetts with its principal address at 175 Berkeley Street, Massachusetts 02116 and can be served via registered agent Corporation Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## Jurisdiction & Venue

7.      This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 556 U.S. 368, 372 (2012).

8.      This Court has specific personal jurisdiction over the Defendants because they have repeatedly placed calls to people in Texas with Texas telephone area codes, and derive revenue from the State of Texas, and they sell home and auto insurance to people in Texas, including the Plaintiff.

2

9.      Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(1)-(2) in that Defendants

conduct business in, and a substantial part of the events giving rise to Plaintiff's claims occurred

in El Paso County, Texas, and Plaintiff's place of employment is located in El Paso, TX and was

physically present in Texas for all calls, in this case in El Paso County, Texas. Defendants

conduct business in this judicial district by calling people in Texas.

## Background

## The Telephone Consumer Protection Act

10.     The Telephone Consumer Protection Act 10. In 1991, Congress enacted the TCPA to

regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized

that "[u]nrestricted telemarketing ... can be an intrusive invasion of privacy[.]" Telephone

Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. §

227).

### The TCPA Prohibits Automated Telemarketing Calls

11.     The TCPA makes it unlawful "to make any call (other than a call made for emergency

purposes or made with the prior express consent of the called party) using an automatic

telephone dialing system or an artificial or prerecorded voice ... to any telephone number

assigned to a ... cellular telephone service ... or any service for which the called party is charged

for the call." See 47 U.S.C. § 227(b)(l)(A)(iii).

12.     The TCPA provides a private cause of action to persons who receive calls in violation of

47 U.S.C. § 227(b)(l)(A). See 47 U.S.C. § 227(b)(3).

13.     According to findings by the Federal Communication Commission ("FCC"), the agency

Congress vested with authority to issue regulations implementing the TCP A, such calls are

prohibited because, as Congress found, automated or prerecorded telephone calls are a greater

3

nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and

inconvenient.

14.     The FCC also recognized that "wireless customers are charged for incoming calls

whether they pay in advance or after the minutes are used." *In re Rules and Regulations*

*Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order,

18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003).

15.     In 2013, the FCC required prior express written consent for all autodialed or prerecorded

telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it

ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed
> and be sufficient to show that the consumer: (1) received "clear and conspicuous
> disclosure" of the consequences of providing the requested consent, i.e., that the
> consumer will receive future calls that deliver prerecorded messages by or on
> behalf of a specific seller; and (2) having received this information, agrees
> unambiguously to receive such calls at a telephone number the consumer
> designates.[] In addition, the written agreement must be obtained "without
> requiring, directly or indirectly, that the agreement be executed as a condition of
> purchasing any good or service.[]" In the Matter of Rules & Regulations
> Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C. Rcd. 1830, 1844
> (2012) (footnotes omitted).

The National Do-Not-Call Registry

16.     The National Do Not Call Registry allows consumers to register their telephone numbers

and thereby indicate their desire not to receive telephone solicitations at those numbers. See 47

C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the

registration is cancelled by the consumer or the telephone number is removed by the database

administrator." Id.

4

17.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

18.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

19.     Under the TCPA, a text message is a call. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016).

## The Texas Business and Commerce Code 305.053

20.     The Texas Business and Commerce code has an analogous portion that is related to the TCPA and was violated in this case.

21.     The Plaintiff may seek damages under this Texas law for violations of 47 U.S.C. § 227 or subchapter A and seek $500 in statutory damages or $1,500 for willful or knowing damages.

## Factual Allegations

22.     Plaintiff's personal cellular telephone number (915) 276-4132 has been successfully registered on the National Do-Not-Call Registry since April 29, 2010.

23.     Plaintiff's personal cellular telephone number is a "residential" telephone number that he uses for various personal, family, and household purposes, such as sending and receiving emails, timing food when cooking, sending and receiving text messages, calling friends and family while at home, using the phone's alarm function to wake up in the morning, and for navigation purposes.

24.     Defendant Everquote is a vendor that Defendant Liberty and/or Liberty's agents hire to generate "leads" by robocalling telephone numbers without express written consent from consumers to advertise and encourage the purchase of Liberty's insurance policies. Plaintiff

received telemarketing calls made or commissioned by Defendant Everquote at the behest of Liberty and/or Liberty's agents, despite the fact that his telephone number was already on the National Do Not Call Registry.

25.     Defendant Liberty sells auto and home insurance to consumers.

26.     Defendants use telemarketing to promote their goods and services.

27.     At all times material hereto, Plaintiff was the subscriber of the telephone number (915) 276-4132 and paid his cell phone bill from his personal account.

28.     The Plaintiff has received at least fourteen (14) robocalls in the same day to his personal cell phone number (915) 276-4132, from Defendant Everquote without his prior express written consent and not related to an emergency purpose, soliciting home and auto insurance on behalf of Defendant Liberty.

29.     Plaintiff received these calls from spoofed caller ID's that were initiated using an automatic telephone dialing system ("ATDS") with two calls that started with an automated or prerecorded voice message. The calls generally had a delay of 3-4 seconds of dead air before an audible tone connected Plaintiff to a representative, indicating the calls were initiated using an ATDS.

30.     Defendant Liberty knowing and willfully authorizes Defendant Everquote to place illegal robocalls to millions of consumers *en masse* because it benefits Defendant Liberty financially when consumers purchase home or auto insurance policies from them.

31.     Defendants Everquote and Liberty have been sued on multiple occasions for violations of the TCPA including a few class action lawsuits to mention *Lester v. Everquote, Inc.*, No. 1:16-cv-10651-MLW (D.MA., Apr 1. 2016), *Scavo v. Everquote, Inc.,* et al., No. 2:20-cv-03713-JD (ED.PA., Jul 30. 2020), *Fralish v. Liberty Mutual Insurance Company*, No. 3:22-cv-00336-DRL-

6

MGG (N.D.IN., Apr 28. 2022) and refuse to curtail their behavior because violating the TCPA benefits Defendants Everquote and Liberty financially when consumers purchase their insurance policies.

32.     On May 14, 2022 at 9:23 AM, Plaintiff received a phone call to his personal cell phone 4132 from Defendant Everquote from phone number (769) 254-1325.

33.     Plaintiff answered and heard an artificial or prerecorded voice message about auto and home insurance quotes. Plaintiff was aggravated for being interrupted during work and disconnected the call.

34.     About an hour later Plaintiff received another call to his personal cell phone ending in 4132 from Defendant Everquote from phone number (254) 268-1181.

35.     Plaintiff answered and heard the same artificial or prerecorded voice message about auto and home insurance quotes. Plaintiff was extremely annoyed and aggravated and followed the prompts for the sole purposes of identifying the parties responsible for the illegal robocalls.

36.     Plaintiff was then connected to a live representative that stated they were calling on behalf of Defendant Everquote to provide Plaintiff with the best home and auto insurance rates.

37.     The representative asked Plaintiff if he had about fifteen (15) minutes to speak with a "qualified agent."

38.     Plaintiff was not in the market for home or auto insurance but advised the representative he was for the sole purposes of identifying the companies responsible for the illegal robocalls.

39.      The phone call disconnected while transferring.

40.     About twenty minutes later Plaintiff received another call to his personal cell phone number ending in 4132 from Defendant Everquote from phone number (915) 295-9156.

41.     Plaintiff answered and there was a delay of 3-4 seconds of dead air before an audible tone connected Plaintiff to a representative, indicating the call was initiated using an ATDS.

42.     The representative advised Plaintiff they were calling to provide Plaintiff with the best home and auto insurance rates.

43.     Plaintiff advised the representative that he was no longer interested and to stop calling him.

44.     Despite Plaintiff advising the representative from Defendant Everquote to stop calling him to his personal cell phone, Defendant Everquote representatives bombarded Plaintiff with a series of phone calls almost back-to-back to his personal cell phone number ending in 4132 regarding home and auto insurance rates.

45.     On May 14, 2022 at 11:07 AM Plaintiff received a phone call from Defendant Everquote (915) 221-6443.

46.     Plaintiff answered and there was a 3-4 second delay followed by an audible tone before being connected to a representative named Kenya Oliver from Defendant Everquote who then asked Plaintiff qualifying questions for home insurance. The representative asked Plaintiff if he had about fifteen (15) minutes to speak with a "qualified agent."

47.     Plaintiff was extremely annoyed and frustrated for continuing to receive phone calls to his personal cell phone from Defendant Everquote after advising them multiple times to stop calling and advised Kenya he was interested for the sole purposes of identifying the companies responsible for the illegal robocalls.

48.     Plaintiff was then transferred to a representative named Katherine Scott who advised Plaintiff she was with Defendant Liberty.

49.     Katherine then solicited Plaintiff for home insurance on behalf of Defendant Liberty.

8

50.     Katherine sent Plaintiff an email from Katherine.scott@libertymutual.com which revealed the company responsible for authorizing Defendant Everquote to make illegal robocalls on their behalf.

51.     Each and every phone call Plaintiff received from Defendant Everquote had a delay of 3-4 seconds of dead air before an audible tone connected Plaintiff to a representative, indicating the calls were initiated using an ATDS.

52.     Plaintiff sent a request for Defendant Everquote's internal do not call policy to press@everquote.com on May 21, 2022.

53.     Plaintiff e-mailed a request for Defendant Liberty's internal do not call policy to Katherine.scott@libertymutual.com on May 21, 2022.

54.     Defendants Everquote and Liberty failed and/or refused to send Plaintiff a copy of any internal do not call policy.

55.     Plaintiff believes, and therefore avers, that Defendants Everquote and Liberty did not train their representatives to honor and abide by DNC requests made by consumers.

56.     It is evidently Defendants' business practice to continue placing sales calls to consumers who have already made DNC requests and who have stated they are not interested in Defendants' services. Such conduct violates the TCPA and its implementing regulations, 47 CFR § 64.1200(d)(3)(requiring telemarketers to honor and record DNC requests when made).

57. Defendants on nine occasions used a local area code (915) where Plaintiff resides to trick him into thinking the calls were local.

58.     Table A below displays calls made to Plaintiff by Defendants:

| Number: | Date | Time | Caller ID | Notes |
|---------|------|------|-----------|-------|
| 1 | 05/04/2022 | 9:23 AM | 769-254-1325 | Prerecorded voice message from Everquote disconnected the call. |
| 2 | 05/04/2022 | 10:35 AM | 254-268-1181 | Prerecorded voice message from |

|  |  |  |  | Everquote call dropped while transferring. |
|---|---|---|---|---|
| 3 | 05/04/2022 | 10:57 AM | 915-295-9156 | Direct Call from Everquote told them stop calling |
| 4 | 05/04/2022 | 10:58 AM | 915-221-6157 | Direct Call from Everquote told them stop calling |
| 5 | 05/04/2022 | 10:59 AM | 915-701-2187 | Direct Call from Everquote missed call |
| 6 | 05/04/2022 | 11:01 AM | 857-217-1749 | Direct Call from Everquote told them stop calling |
| 7 | 05/04/2022 | 11:03 AM | 915-295-9156 | Direct Call from Everquote missed call |
| 8 | 05/04/2022 | 11:04 AM | 225-254-3339 | Direct Call from Everquote told them stop calling |
| 9 | 05/04/2022 | 11:05 AM | 915-295-9156 | Direct Call from Everquote missed call |
| 10 | 05/04/2022 | 11:07 AM | 915-221-6443 | Direct Call from Everquote transferred to Liberty |
| 11 | 05/04/2022 | 11:13AM | 915-221-6212 | Direct Call from Everquote told them stop calling |
| 12 | 05/04/2022 | 11:14 AM | 915-221-6203 | Direct Call from Everquote missed call |
| 13 | 05/04/2022 | 11;19 AM | 915-221-6192 | Direct Call from Everquote told them stop calling |
| 14 | 05/04/2022 | 11:31 AM | 507-203-6032 | Direct Call from Everquote told them stop calling |

59.     Plaintiff did not provide his phone number to Defendants or any third-party operating on their behalf, let alone provide his prior express written consent to receive phone calls promoting home and/or auto insurance.

60.     Plaintiff has never had any relationship with Defendants prior to the alleged robocalls.

61.     Defendant Liberty provided instruction and guidance to Defendant Everquote on who to solicit and the minimum qualifications of potential customers.

62.     Plaintiff pays for each incoming and outgoing call on his telephone under an unlimited calling arrangement, as defined and set forth in 47 CFR § 64.1200(a)(1)(iii).

63.     Plaintiff received the calls on his private mobile telephone, as defined and set forth in 47 CFR § 64.1200(a)(1)(iii). Plaintiff's telephone number is registered as a cellular telephone number and is used for personal purposes.

64.     These telephone solicitations constituted "calls" under the TCPA that were not for emergency purposes.

65.     Plaintiff was harmed by these calls. Plaintiff was temporarily deprived of legitimate use of his phone because the phone line was tied up during the telemarketing calls and his privacy was improperly invaded. Moreover, these calls injured Plaintiff because they were frustrating, obnoxious, annoying, were a nuisance and disturbed the solitude of Plaintiff. The calls caused Plaintiff's cell phone battery's depletion, used up cellular data, and prevented Plaintiff from otherwise using his telephone for lawful purposes.

## VICARIOUS LIABILITY OF DEFENDANT LIBERTY

66.     Defendant Liberty is vicariously liable for the telemarketing calls that generated the lead for Liberty.

67.     The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

68.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

69.     The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

70.    The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post

may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its
> telemarketing activities to unsupervised third parties would leave
> consumers in many cases without an effective remedy for telemarketing
> intrusions. This would particularly be so if the telemarketers were
> judgment proof, unidentifiable, or located outside the United States, as is
> often the case. Even where third-party telemarketers are identifiable,
> solvent, and amenable to judgment limiting liability to the telemarketer
> that physically places the call would make enforcement in many cases
> substantially more expensive and less efficient, since consumers (or law
> enforcement agencies) would be required to sue each marketer separately
> in order to obtain effective relief. As the FTC noted, because sellers may
> have thousands of independent marketers, suing one or a few of them is
> unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted) (alteration

marks and internal quotation marks omitted).

71.    More specifically, *Dish* held that, even in the absence of evidence of a formal contractual

relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the

telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

72.    The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's

liability requires a finding of formal agency and immediate direction and control over the third-

party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

73.    To the contrary, the FCC—armed with extensive data about robocallers and Americans'

complaints about them—determined that vicarious liability is essential to serve the TCPA's

remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587

¶ 36.

12

74.     Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

75.     Defendant Liberty is legally responsible for ensuring that the affiliates that make telemarketing calls on its behalf comply with the TCPA when so doing.

76.     Defendant Liberty knowingly and actively accepted business that originated through illegal telemarketing.

77.     Defendant Liberty knew (or reasonably should have known) that its telemarketer was violating the TCPA on its behalf but failed to take effective steps within Liberty's power to force the telemarketer to cease that conduct.

78.     By hiring a company to make calls on its behalf, Defendant Liberty "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

79.     Moreover, Defendant Liberty maintained interim control over the actions of its telemarketers.

80.     For example, Defendant Liberty had absolute control over whether, and under what circumstances, it would accept a customer from its telemarketers.

81.     Furthermore, Defendant Liberty had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using an ATDS or prerecorded messages to contact potential customers of Liberty and the ability to require them to respect the National Do Not Call Registry.

82.     Defendant Liberty also gave interim instructions to its telemarketers by providing lead-qualifying instructions and lead volume limits.

83.     Defendant Liberty donned its telemarketers with apparent authority to make the calls at issue. Thus, the telemarketers not only pitched home and auto insurance in the abstract, but also specifically pitched Liberty by name.

84.     Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

85.     "[A]pparent authority can arise in multiple ways, and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

86.     A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

87.     Defendant Liberty's telemarketer, Everquote, transferred customer information, including Plaintiff's contact information, directly to Liberty. Thus, the telemarketer had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

88.     Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

14

89.     Defendant Liberty is the liable party as the direct beneficiary of the illegal telemarketing calls as it stood to gain Plaintiff as a customer when Defendant Everquote solicited Plaintiff for home and auto insurance.

## Causes Of Action

### First Cause of Action
(Negligent Violations of the TCPA, "ATDS" Prohibition, 47 U.S.C. § 227(b) et seq.)

90.     Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

91.     Defendants called Plaintiff's cellular telephone using an "automatic telephone dialing system" as defined by the TCPA on at least fourteen (14) occasions in violation of 47 U.S.C. § 227(b)(1)(A)(iii).

92.     As a result of Defendants' and Defendants' agents' negligent violations of 47 U.S.C. § 227(b)(1)(A), Plaintiff seeks for himself $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

93.     Pursuant to 47 U.S.C. § 227(b)(3)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

### Second Cause of Action
(Knowing and/or Willful Violation of the TCPA's
"ATDS" Prohibition, 47 U.S.C. § 227(b) et seq.)

94.     Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

95.     Defendants called Plaintiff's cellular telephone using an "automatic telephone dialing system" as defined by the TCPA on at least fourteen (14) occasions in violation of 47 U.S.C. § 227(b)(1)(A)(iii).

96.     Plaintiff was statutorily damaged at least fourteen (14) times under 47 U.S.C. §

227(b)(3)(B) by the Defendants by the telephone calls described above.

97.     As a result of Defendants' and Defendants' agents knowing and/or willful violations of

47 U.S.C. § 227(b)(1)(A), Plaintiff seeks for himself treble damages, as provided by statute, up

to $1,500.00 for each and every violation, pursuant to 47 U.S.C. § 227(b)(3).

98.     Pursuant to 47 U.S.C. § 227(b)(3)(A), Plaintiff seeks injunctive relief prohibiting such

conduct in the future.

## Third Cause of Action
(Negligent Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. § 227(c) et seq.)

99.     Plaintiff incorporates and realleges, as though fully set forth herein, each of the

paragraphs above.

100.    Defendants called Plaintiff's private residential telephone number which was successfully

registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls,

in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

101.    Plaintiff was statutorily damaged at least fourteen (14) times under 47 U.S.C. §

227(c)(3)(F) by the Defendants by the telephone calls described above, in the amount of $500.00

per call.

102.    As a result of Defendants' and Defendants' agents' violations of 47 U.S.C. §

227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2), Plaintiff seeks for himself $500 in statutory

damages for each and every violation, pursuant to 47 U.S.C. § 227(c)(3)(F).

103.    Pursuant to 47 U.S.C. § 227(c), Plaintiff seeks injunctive relief prohibiting

such conduct in the future.

## Fourth Cause of Action

(Knowing and/or Willful Violation of the TCPA

"Sales Call/DNC" Prohibition, 47 U.S.C. § 227 et seq.)

104. Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

105. Defendants called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

106. Plaintiff was statutorily damaged at least fourteen (14) times under 47 U.S.C. § 227(c)(3)(F) by the Defendants by the telephone calls described above, in the amount of $500.00 per call.

107. As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. 64.1200(c)(2), Plaintiff seeks for himself treble damages, as provided by statute, up to $1,500.00 for each and every violation, pursuant to 47 U.S.C. § 227(c)(5).

## Fifth Cause of Action

(Violations of The Texas Business and Commerce Code 305.053)

108. Plaintiff incorporates the foregoing allegations as if set forth herein.

109. The foregoing acts and omissions of Defendant and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing robocalls to Plaintiff's cellular telephone number without his prior express written consent in violation of 47 U.S.C. § 227 et seq. The Defendants violated 47 U.S.C. § 227(d) and 47 U.S.C. § 227(d)(3) and 47 U.S.C. § 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

110. Plaintiff seeks for himself an award of at least $500.00 in damages for each such violation. **Texas Business and Commerce Code 305.053(b).**

17

111.    Plaintiff seeks for himself an award of up to $1,500.00 in damages for each such knowing

or willful violation. **Texas Business and Commerce Code 305.053**(c).

## **WHEREFORE, Plaintiff prays for relief against Defendants, and each of them, as follows:**

### **Prayer for Relief**

WHEREFORE, Plaintiff Abraham Pienado prays for judgment against the Defendants,

jointly and severally, as follows:

A.  Leave to amend this Complaint to name additional DOESs as they are identified and
    to conform to the evidence presented at trial;

B.  A declaration that actions complained of herein by Defendants violate the TCPA and
    Texas state law;

C.  An injunction enjoining Defendants and their affiliates and agents from engaging in
    the unlawful conduct set forth herein;

D.  An award of $3,000.00 per call in statutory damages arising from the TCPA
    intentional violations jointly and severally against the Defendants for fourteen (14)
    calls.

E.  An award of $1,500.00 in statutory damages arising from violations of the Texas
    Business and Commerce code 305.053

F.  An award to Mr. Pienado of damages, as allowed by law under the TCPA;

G.  An award to Mr. Pienado of interest and costs, as allowed by law and equity

H.  Such further relief as the Court deems necessary, just, and proper.

### **JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

18

Dated: May 27, 2022

Abraham Peinado
*Plaintiff, Pro Se*
104 Thoroughbred Ct
Santa Teresa, NM 88008
Phone: 915-276-4132
Clovers.ap77@gmail.com